UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- X

In re ASHAPURA MINECHEM LTD,      :          OPINION AND ORDER
                                  :
            Debtor.               :          Chapter 15 Case No.
                                  :          11-14668 (JMP)
                                  :
-------------------------------------------------- X
                                  :
ARMADA (SINGAPORE) PTE            :
LTD,                              :
                                  :
            Appellant,            :
                                  :          12 Civ. 257 (SAS)
      - against -                 :
                                  :
CHETAN SHAH, in his Capacity as the  :
Foreign Representative of         :
ASHAPURA MINECHEM LTD,            :
                                  :
            Appellee.             :
-------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

        Appellant Armada (Singapore) Pte Ltd. ("Armada") appeals pursuant

to section 158 of Title 28 of the United States Code from a Bench Decision of the

Bankruptcy Court for the Southern District of New York granting Appellee

Ashapura Minechem Ltd.'s ("Ashapura") petition for recognition as a foreign main

proceeding of an insolvency proceeding voluntarily commenced in India by

-1-

Ashapura.  For the reasons set forth below, the Bench Decision is affirmed.

## II.    BACKGROUND

Appellee Chetan Shah is the Managing Director of Ashapura Minechem Ltd., a mining and industrial business headquartered in Mumbai, India.[1] He was appointed Foreign Representative by Ashapura's Board of Directors for the purpose of these U.S. proceedings.[2]  The greater part of Ashapura's assets are situated in India, as are all of its employees.[3]

In the conduct of its business, Ashapura entered into maritime Contracts of Affreighment ("COAs") to ship minerals to foreign ports with several international shipping companies including Appellant Armada (Singapore) Pte Ltd. ("Armada"), based in Singapore, and Eitzen Bulk A/S ("Eitzen").[4]  However, when the government of Gujarat, the Indian state where Ashapura conducts its mining activities, placed an indirect embargo on the export of bauxite, Ashapura failed to

---

[1]     *See In re Ashapura Minechem Ltd.*, No. 11 B. 14668, 2011 WL 5855475, at *1 (Bankr. S.D.N.Y. Nov. 22, 2011).

[2]     *See* Amended Response Brief of Appellee Ashapura Minechem Ltd. ("Appellee Mem.") at 15.

[3]     *See* Opening Brief of Appellant Armada (Singapore) Pte Ltd. ("Appellant Mem.") at 10.

[4]     *See In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *2.

fulfill its part of the contracts.[5]  Armada sought and in February 2010 obtained an

arbitration award against Ashapura totaling sixty-five million dollars.[6]  Eitzen

obtained a separate award as well.[7]  Ashapura opted not to defend these arbitrations

on the ground that the contracts were void ab initio under the doctrine of force

majeure.[8]

    In June 2010, Armada filed a petition in the Southern District of New

York for an order converting its arbitration award into a judgment against

Ashapura.[9]  The petition was granted and the court entered a judgment for Armada

in excess of seventy million dollars.[10]

    In May 2011, Ashapura initiated proceedings before India's Board for

Industrial and Financial Reconstruction ("BIFR") to rehabilitate its finances under

The Sick Industrial Companies Act ("SICA") of 1985.[11]  That proceeding is still

---

[5]  *See id.*; Appellee Mem. at 12.

[6]  *See* Appellee Mem. at 12.

[7]  *See id*.

[8]  *See In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *2.

[9]  *See* Petition for an Order Confirming Foreign Arbitral Awards, *Armada (Singapore) Pte Ltd. v. Ashapura Minechem Ltd.* ("*Armada*"), No. 10 Civ. 4856 (S.D.N.Y. June 22, 2010) (Docket No. 1).

[10]  *See* Order, *Armada* (July 29, 2010) (Docket No. 14).

[11]  *See* Appellee Mem. at 15.

pending before the BIFR.[12]  Pursuant to section 22 of SICA, Ashapura obtained a stay of all actions and proceedings against it in India.[13]  However, this foreign insolvency law has encountered mounting criticism and led to a repeal of the statute that governs the BIFR proceeding.[14]  The SICA Repeal Act of 2003 would eliminate section 22 stays on unsecured creditors' collection efforts.[15]  However, the current iteration of SICA will remain in force until the Indian legislature formally enacts implementing legislation for SICA's substitute.[16]  The Indian legislature had not done so by the time the Bankruptcy Court made its ruling and the parties have not notified this Court of any change.

In October 2011, Ashapura's Board of Directors authorized Shah to seek relief in bankruptcy court under Chapter 15 of Title 11.[17]  Shah's initial request for a preliminary injunction against creditor claims was denied.[18]

---

[12]     *See In re Ashapura*, 2011 WL 5855475, at *1.

[13]     *See* Appellant Mem. at 11.

[14]     *See In re Ashapura*, 2011 WL 5855475, at *1.

[15]     *See* Recognition Hearing Transcript ("Tr.") 93:23-94:4, Nov. 18, 2011.

[16]     *See In re Ashapura*, 2011 WL 5855475, at *1.

[17]     *See* Appellee Mem. at 15.

[18]     *See* Appellant Mem. at 14.

Subsequently, Shah filed a petition for recognition of the SICA proceeding as a "foreign proceeding" or "foreign main proceeding" pursuant to Chapter 15 of Title 11.[19]  A hearing was held on November 18, 2011 during which an Indian attorney at law Mayur Bhatt testified on behalf of Ashapura.[20]  Bhatt is Ashapura's counsel in the BIFR proceedings and has experience handling other SICA cases.[21]  Armada did not call any witnesses, but instead offered various exhibits into evidence that were downloaded from internet sites.[22]

Following that hearing, the bankruptcy court granted recognition as a foreign main proceeding and relief pursuant to section 1521(a) to Ashapura and granted a stay against the order enforcing the arbitration award – rulings which Armada now appeals.[23]

## III.   LEGAL STANDARD

### A.   Appellate Jurisdiction

This court has jurisdiction to hear appeals from final orders issued by

---

[19]     *See In re Ashapura*, 2011 WL 5855475, at *1.

[20]     *See* Tr. 7:23-25.

[21]     *See id.* 7:25-8:1.

[22]     *See In re Ashapura*, 2011 WL 5855475, at *4.

[23]     *See id.* at *5.

the Bankruptcy Court under sections 158(a)(1) and 1334 of Title 28.[24]

## B.    Standard of Review

A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[25] Findings of fact are reviewed for clear error[26] whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo.[27] Credibility determinations by bankruptcy courts are reviewed for clear error, as are decisions resting on physical or documentary evidence or inference from other facts.[28] A finding of fact is clearly erroneous if the court is "'left with the definite and firm conviction that a mistake has been

---

[24]    See In re Fairfield Sentry Ltd., No. 10 Civ. 7311, 2011 U.S. Dist. LEXIS 105770, at *7 (S.D.N.Y. Sept. 15, 2011) (treating a Chapter 15 recognition as a final order for purposes of appeal). Accord In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325, 327 (S.D.N.Y. 2008) (affirming denial of recognition as a "final" order).

[25]    See In re Sanshoe Worldwide Corp., 993 F.2d 300, 305 (2d Cir. 1993).

[26]    See Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). Accord In re Cody, Inc., 338 F.3d 89, 94 (2d Cir. 2003).

[27]    See In re Bear Stearns, 389 B.R. at 333.

[28]    See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1308 (5th Cir. 1985) (citing Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985)).

committed.'"[29]

## C. Recognition of a Foreign Insolvency Proceeding

Chapter 15 of Title 11 governs all cross-border insolvency disputes, and specifically petitions for the recognition of foreign insolvency proceedings in the United States.[30]  The purpose of Chapter 15 is "to incorporate the Model Law on Cross-Border Insolvency," adopted by the United Nations Commission on International Trade Law (UNCITRAL) in 1997.[31]  "Recognition [under section 1517] is not a rubber stamp exercise, and any such presumption is rebuttable upon the Court's examination of any and all relevant facts."[32]

As a threshold matter, the appointed representative of a foreign debtor seeking recognition must establish that the proceeding is a "foreign proceeding" under the meaning of section 101(23).[33]  The foreign representative thus carries the

---

[29]    *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v.  U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[30]    *See* 11 U.S.C. § 1501(b) (2005).

[31]    *Id.* § 1501(a).

[32]    *In re Gold & Honey, Ltd.*, 410 B.R. 357, 366 (Bankr. E.D.N.Y. 2009) (quotation marks omitted).

[33]    *See* 11 U.S.C. §§ 1501(b)(1), 1515(a), 1517(a).  *Accord In re ABC Learning Centres Ltd.*, 445 B.R. 318, 327 (Bankr. D. Del. 2010) ("As a threshold matter, this Court must first determine whether the Liquidation Proceedings are 'foreign proceedings' as defined by [section] 101(23), as only 'foreign proceedings' are eligible for recognition under [c]hapter 15."); *In re Betcorp Ltd.*,

burden of proving each of seven criteria:

> (i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.[34]

Failure to meet the burden of proof on any one of the definitional elements requires denial of the petition.[35]

### 1.      A Collective Proceeding

To be entitled to Chapter 15 recognition, petitioner must prove that the proceeding at issue was collective in nature.  First and foremost, "[a] collective proceeding is one that considers the rights and obligations of *all* creditors"[36] – that

---

400 B.R. 266, 275 (Bankr. D. Nev. 2009) ("As a preliminary matter . . . the court must determine whether [debtor]'s winding up is a 'foreign proceeding' within the meaning of [section] 101(23).").

[34]      *In re Betcorp Ltd.*, 400 B.R. at 277.  *See* 11 U.S.C. § 101(23) (defining a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation").

[35]      *See In re Betcorp Ltd.*, 400 B.R. at 276-77.

[36]      *Id.* at 281 (emphasis added) (holding that a voluntary winding up "fits this 'collective' criterion," whereas "a receivership remedy instigated at the request, and for the benefit, of a single secured creditor" does not).  *Accord In re*

is for the general benefit of creditors.

> [T]he word 'collective' . . . contemplates both the consideration
> and eventual treatment of claims of various types of creditors,
> as well as the possibility that creditors may take part in the
> foreign action. . . . In determining whether a particular foreign
> action is collective . . . it is appropriate to consider both the law
> governing the foreign action and the parameters of the
> particular proceeding as defined in, for example, orders of a
> foreign tribunal overseeing the action.[37]

"A collective proceeding is designed to provide equitable treatment to creditors, by

treating similarly situated creditors in the same way, and to maximize the value of

the debtor's assets for the benefit of all creditors . . . ."[38]  Indeed, among Chapter

15's objectives is the "fair and efficient administration of cross-border insolvencies

---

*British Am. Ins. Co.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010) ("For a proceeding
to be collective within the meaning of section 101(23), it must be instituted for the
benefit of creditors generally rather than for a single creditor or class of
creditors."); *In re ABC Learning Centres Ltd.*, 445 B.R. at 328 (citing as a
provision of the foreign insolvency statute that evinced the collective nature of the
proceeding in question "[section] 501 (liquidator has a duty to consider the rights
of all creditors in distributing the corporation's property)"); *In re Bd. of Dirs. of
Hopewell Int'l Ins., Ltd.*, 275 B.R. 699, 707 (S.D.N.Y. 2002) (deeming a "scheme
of arrangement" for creditors to file claims collective in nature because all
creditors could object to the scheme); *In re Gold & Honey, Ltd.*, 410 B.R. at 368
(finding a proceeding non-collective that was "more akin to a[n] individual
creditor's replevin or repossession action than it is to a reorganization or
liquidation by an independent trustee").

[37]     *In re British Am. Ins. Co.*, 425 B.R. at 902.

[38]     U.N. Comm'n on Int'l Law, Legislative Guide
on Insolvency Law, ¶ 35 (2005)
http://www.uncitral.org/pdf/english/texts/insolven/05-80722_Ebook.pdf.

that protects the interests of all creditors."[39]  Further, UNCITRAL's Guide to

Enactment "suggests that a foreign proceeding must contemplate the 'involvement

of creditors collectively.'"[40]  However, to be for the general benefit of creditors, a

proceeding need not ensure that all creditors receive a share of the distribution.[41]

      Other characteristics of a collective proceeding include:  adequate

notice to creditors under applicable foreign law,[42] provisions for the distribution of

assets according to statutory priorities,[43] and a statutory mechanism for creditors to

---

[39]     11 U.S.C. § 1501.

[40]     *In re British Am. Ins. Co.*, 425 B.R. at 902 (quoting U.N. Comm'n on Int'l Law, UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment, ¶ 23 (1997) http://www.uncitral.org/pdf/english/texts/insolven/insolvency-e.pdf).

[41]     *See id.* at 903 ("[The judicial manager] ultimately projects that general creditors of BAICO will receive no distribution in the eventual winding up of the company due to the priority accorded to policyholders under Bahamas law. However, by addressing the potential distribution to other creditors [the judicial manager] acknowledges his overall duty to creditors in general.").

[42]     *See In re ABC Learning Centres Ltd.*, 445 B.R. at 329 ("The notice provided to creditors is a proper consideration when assessing the collective nature of a proceeding.").

[43]     *See, e.g.*, *id.* at 328 (citing as another statutory provision that evinced a proceeding's collective nature "[section] 555 (subject to priorities, preferences, etc., debts and claims rank equally and are to be paid pro rata)").  *Accord In re Gold & Honey, Ltd.*, 410 B.R. at 372 (noting that one of the "most fundamental policies and purposes of the automatic stay" is "[to] provid[e] for the efficient and orderly distribution of a debtor's assets to all creditors in accordance with their relative priorities"); U.N. Comm'n on Int'l Law, Model Law on Cross-Border Insolvency: The Judicial Perspective, ¶ 66 (2012) ("The notion of a 'collective'

seek court review of the proceeding.[44]  However, the standard for notice is not a

demanding one.[45]

### 2.    Debtor's Assets and Affairs Subject to Foreign Court's Control or Supervision

Petitioner must also prove that the debtor's assets and affairs are

subject to a foreign court's jurisdiction.  Section 1502 of the Bankruptcy Code

defines "foreign court" as "a judicial *or other* authority competent to control or

supervise a foreign proceeding."[46]  The body conducting the proceeding can be

─────────────

insolvency proceeding is based on the ability of a single insolvency representative
to control the realization of assets for the purposes of pro rata distribution among
all creditors (*subject to domestic statutory priorities*)." (emphasis added)).

[44]     *See In re ABC Learning Centres Ltd.*, 445 B.R. at 329 ("[Section]
1321 of the Act provides that a person including creditors aggrieved by any act,
omission or decision of . . . a liquidator may appeal to an Australian court and the
court may confirm, reverse or modify the act or decision . . . ." (quotation marks
omitted)).

[45]     *See In re British Am. Ins. Co.*, 425 B.R. at 902 (finding a foreign
proceeding alleged to be for the sole benefit of a single class of creditors a
collective proceeding, even though unsecured creditors did not receive notice of
actions brought before the court, because they would receive notice at the winding
up phase and they were statutorily allowed to be heard in the judicial management
process).  *Accord In re ABC Learning Centres Ltd.*, 445 B.R. at 329 (finding that
notice was adequate where it was proper under the relevant foreign statute and the
creditor had actual notice of the creditor's meeting as well as the ability to appeal
the outcome of the proceeding at the Australian court).

[46]     11 U.S.C. § 1502 (emphasis added).

considered a foreign court.[47]  Case law confirms that this is a dual requirement –
both the debtor's assets *and* affairs must be subject to judicial control or supervision
in the proceeding.[48]  Ashapura does not contest the duality of this requirement.[49]

Supervision or control of the company's affairs is not a demanding
standard.  The foreign court need not control the day-to-day operations of the
debtor.[50]  It is sufficient, for instance, that the body monitor compliance with the
repayment plan negotiated between the debtor and creditors.[51]  One court has held
that the mere fact that a commission was granted authority from a Spanish court to
recover a set-off from an arbitration proceeding for distribution to creditors "plainly
demonstrate[d] that the [court] maintains control of [both the debtor's] assets *and*
*affairs*."[52]  By contrast, the fact that actions in a foreign court related to the

---

[47]     *See In re Tradex Swiss AG*, 384 B.R. 34, 42 (Bankr. D. Mass. 2008)
("Even if the decree of the [Swiss Federal Banking Commission] were not subject
to appeal to the Swiss Federal Administrative Court . . . the SFBC itself comes
within the definition of a foreign court.").

[48]     *See In re Gold & Honey, Ltd.*, 410 B.R. at 371 (denying recognition
when the party demonstrated control over debtor's assets but not affairs).

[49]     *See* Appellee Mem. at 21.

[50]     *See In re Oversight and Control Commission of Avanzit* ("*Avanzit*")*,
S.A.*, 385 B.R. 525, 531-32 (Bankr. S.D.N.Y. 2008).

[51]     *See id*. at 536.

[52]     *Id.* at 534 (emphasis added).

-12-

proceeding are typically initiated by interested parties and that liquidators proceed with most of their duties without court involvement was found "not [to] undermine the . . . court['s] supervisory role."[53]

### 3.    Proceeding Under a Law Related to Insolvency

Petitioner also carries the burden of proving that the SICA filing was a proceeding "authorized or conducted under a law related to insolvency or the adjustment of debts."[54]  The proceeding, therefore, must be authorized by a statute that deals with corporate insolvency or the adjustment of corporate debts.  The fact that a proceeding has a "unified structure of the external administration provisions" favors a finding that the statute meets this criterion.[55]  For instance, the fact that "several sub-parts of [c]hapter 5 [of the Australian Corporations Act] . . . combined with the statutory ability of [the Act] to shift among various forms of dissolution given changing circumstances[] demonstrate[s] that the winding up is achieved

---

[53]    *In re ABC Learning Centres Ltd.*, 445 B.R. at 332 ("Most actions in a U.S. Bankruptcy Court are upon the motion of an interested party and are not undertaken sua sponte, U.S. Bankruptcy Courts also give deference to business judgments and do not direct the daily activities of debtors, and the majority of U.S. bankruptcies proceed with minimal court involvement.").

[54]    *Id.* at 327.

[55]    *In re Betcorp Ltd.*, 400 B.R. at 282.

-13-

under a law relating to insolvency or the adjustment of debts."[56]

### 4.      Public Policy Exception

Finally, under Chapter 15, a court may "refus[e] to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."[57]  Parties opposing the recognition of proceedings generally bear the burden of proof on applying public policy exceptions.[58]

A prerequisite to applying section 1506 is that there exist a conflict between foreign and U.S. law – however "that fact alone is not dispositive."[59] While Title 11 does not define what is "manifestly contrary" to U.S. public policy, case law prescribes that this public policy exception should be construed narrowly. It "is intended to be invoked only under exceptional circumstances concerning

---

[56]      *Id.*

[57]      11 U.S.C. § 1506.

[58]      *See Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 356 (S.D.N.Y. 2007) (holding that the party opposing enforcement of an arbitration award carries the burden of proving that its enforcement would violate public policy pursuant to the public policy exception of the New York Arbitration Convention), *aff'd*, 584 F.3d 396 (2d Cir. 2009) .

[59]      *Qimonda AG v. Qimonda AG* (*In re Qimonda*), 433 B.R. 547, 568 (E.D. Va. 2010) (quotation marks and citation omitted).

-14-

matters of fundamental importance for the United States."[60]  Indeed, only one

published decision had found recognition to violate U.S. public policy since

Chapter 15 was enacted at the time the Bankruptcy Court made its decision – and

only two since.[61]

   Courts have adhered to two principles in determining whether a

fundamental policy is at risk:  "[d]eference to a foreign proceeding should not be

afforded in a [c]hapter 15 proceeding where the procedural fairness of the foreign

proceeding is in doubt or cannot be cured by the adoption of additional

protections"[62] and "[a]n action should not be taken in a [c]hapter 15 proceeding

where taking such action would frustrate a U.S. court's ability to administer the

[c]hapter 15 proceeding and/or would impinge severely a U.S. constitutional or

---

   [60] *Lavie v. Ran* (*In re Ran*), 607 F.3d 1017, 1021 (5th Cir. 2010). *Accord Ackermann v. Levine*, 788 F.2d 830, 842 (2d Cir. 1986); *In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly."); *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006).

   [61] *See In re Gold & Honey, Ltd.*, 410 B.R. at 368 (however as the Bankruptcy Court decision being appealed noted, this case is unique in that the bank in question "proceeded in the Israeli Receivership Proceeding in spite of and in the face of [the] Court's Stay Order"); *In re Vitro, S.A.B. de C.V.*, No. 11 B. 33335, 2012 WL 2138112, at *13 (Bankr. N.D. Tex. June 13, 2012) (where the rehabilitation scheme wholly extinguished third-party claims).

   [62] *In re Qimonda*, 433 B.R. at 570.

statutory right . . . ."[63]

As to the first principle, Ashapura is correct that the mere absence of certain procedural or constitutional rights does not by itself satisfy section 1506. For instance, section 1506 does not bar recognition of a proceeding that lacks a right to a jury.[64]  By contrast, denial of the opportunity to be heard and refusal to receive evidence *can* violate public policy.[65]  In *In re Metcalfe*, for instance, the court granted comity to a Canadian proceeding that included third-party releases "that arguably could not be granted in a U.S. bankruptcy proceeding" because "the Canadian court had statutory authority to grant such relief, the question of the Canadian court's jurisdiction had been fully litigated and carefully considered in Canada, including on appeal, and the procedures used in Canada meet our fundamental standards of fairness."[66]

## IV.   DISCUSSION

---

[63]     *Id.*

[64]     *See In re Ephedra*, 349 B.R. at 335-36 ("Federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.").

[65]     *See id.* at 335 (ultimately rejecting these due process arguments "because the Ontario Court adopted amendments to the Canadian order that cured the due process problems").

[66]     *In re Toft*, 453 B.R. 186, 194 (Bankr. S.D.N.Y. 2011) (citing *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010)).

-16-

Armada contends that Ashapura has not carried the burden of proving several of the requirement of section 101(23).[67]  Namely, Armada claims that Ashapura failed to demonstrate that (1) the SICA proceeding was collective in nature, (2) Ashapura's assets and affairs were subject to the control or supervision of the BIFR, and (3) Ashapura's SICA filing is a proceeding under a law related to insolvency.[68]  Further, Armada contends that recognizing the BIFR proceeding violates public policy.  I disagree.

## A.    Ashapura Met Its Burden of Proving that the BIFR Proceeding Was Collective in Nature

The main test of whether a proceeding is collective is whether *all* creditors' interests were considered in the proceeding.  The Bankruptcy Court found that the SICA statute does not provide a formal mechanism for participation by unsecured creditors.[69]  Nonetheless, the Court found that "in practice unsecured creditors were given a voice."[70]

Armada insisted at the November 18 hearing that "[l]earned authorities on Indian law . . . say that there are no rights for unsecured creditors to participate

---

[67]    *See* Appellant Mem. at 16.

[68]    *See id.*

[69]    *See In re Ashapura*, 2011 WL 5855475, at *3.

[70]    *Id.*

-17-

in a SICA reorganization . . . while a stay is in effect, precluding unsecured

creditors from taking action that they would otherwise be taking."[71]  Armada further

contended that the proceeding is "a two part or a closed-door affair, unless the BIFR

chooses to make it different."[72]

However, Ashapura insisted that whatever their statutory rights, *in*

*practice* creditors "have the right to negotiate the scheme of arrangement – or

scheme of rehabilitation"[73] and that "[a]ll unsecured creditors have the right to

object to the scheme of arrangement when it is put before the BIFR to be . . .

confirmed or sanctioned."[74]

Bhatt, Ashapura's witness, testified that unsecured creditors can "make

an application to implead themselves as a party to the proceedings."[75]  In fact,

according to Bhatt, most of the unsecured creditors *have* filed written submissions

to the BIFR in this proceeding.[76]  While creditors' participation in the proceedings

is at the BIFR's discretion, Bhatt named at least three unsecured creditors that have

---

[71]     Tr. 25:2-8.

[72]     *Id*. 154:22-23.

[73]     *Id*. 10:19-20.

[74]     *Id*. 10:23-11:1.

[75]     *Id*. 45:8-9.

[76]     *See id*. 45:11-14.

been impleaded into this proceeding.[77]  Bhatt's testimony is corroborated by Exhibit

2, introduced by Ashapura, that summarized BIFR proceedings held in July 2011.[78]

That exhibit showed that a number of creditors, including Eitzen, were present at

the hearing.[79]  Moreover, creditors can appeal the BIFR's refusal of impleader to a

higher judicial authority.[80]  Bhatt also testified that unsecured creditors have the

right to object to the rehabilitation or distribution scheme once they are impleaded

or if they are refused participation, they have the right to appeal it once it has been

formulated.[81]  Finally, even if unsecured creditors do not actively participate at all,

they have a right to receive distribution under the scheme.[82]

   The Bankruptcy Court found that the evidence adduced by Armada at

the hearing – internet printouts – merely highlighted criticisms of SICA, without

demonstrating that the process itself was not collective.[83]  While Armada insists that

the Court was wrongly influenced by Bhatt's testimony, that is a credibility

---

[77] *See id*. 45:18-22.

[78] *See id*. 52:23-53:9.

[79] *See id*. 62:8-14.

[80] *See id*. 48:5-9.

[81] *See id*. 48:1-9.

[82] *See id*. 48:24-49:2.

[83] *See In re Ashapura*, 2011 WL 5855475, at *4.

determination which I may only review for clear error.  Armada introduced into evidence a report by the Organisation for Economic Co-operation and Development stating that "[p]rovisions of SICA have been abused by errant debtors to seek protection and moratoria from recovery proceedings."[84]  Nonetheless, the Bankruptcy Court found that the proceeding in question considered the interests of all the creditors.  Given the evidence in the record and the fact that Armada did not call any witness to counter Bhatt's testimony, I cannot say with firm conviction that the Bankruptcy Court was mistaken to find Bhatt's testimony that creditors had a voice in this proceeding credible.  I therefore agree with the Bankruptcy Court that this proceeding considered the interests of all creditors *in practice.*

The remaining legal question is whether, given the lack of a *formal* statutory mechanism for creditor participation, the Bankruptcy Court was correct to conclude from the fact that creditors participated in this proceeding in practice that it was collective in nature.  The law is clear that "[i]n determining whether a particular foreign action is collective . . . it is appropriate to consider both the law governing the foreign action and the parameters of the particular proceeding."[85]  What matters is not just what statutory mechanisms exist but also how involved

---

[84]     *Id.* 108:2-4.

[85]     *In re British Am. Ins. Co.*, 425 B.R. at 902.

creditors are in practice.  Therefore, the fact that other SICA proceedings may not fairly involve all creditors does not diminish the collective nature of the proceeding being evaluated here.

Further, as the Bankruptcy Court stated during the hearing, "even if there were no opportunity by practice and custom for unsecured creditors to participate, I think this may still be a collective proceeding, because it involves parties other than just one class of creditor or just one party-in-interest."[86]

The other relevant factors in the analysis – notice, appellate review and statutory priorities for the distribution of assets – also favor a conclusion that the proceeding was collective. As far as notice is concerned, the Bankruptcy Court did not make any explicit findings but impliedly held that notice was adequate under applicable law.[87]  The record suggests that when a SICA proceeding has been filed, it is published online, although creditors are not given individual notice.[88] According to section 18.3 of SICA, once a scheme proposal has been prepared, it is sent in draft form "to any . . . company concerned" as well as published in

---

[86]    Tr. 157:15-19.

[87]    *See In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *3.

[88]    *See* Tr. 104:19-20.

newspapers, though the latter remains at the BIFR's discretion.[89]  This combination of actual notice and notice proper under applicable local law certainly meets the low standard of *In re British American Ins. Co.* and *In re ABC Learning Centres Ltd.*

As far as appellate review is concerned, the Bankruptcy Court found that there was a formal mechanism for court review of adverse determinations. Creditors "ha[ve] the ability to appeal adverse determinations made by the BIFR . . . within the Indian judicial system."[90]  Given Bhatt's testimony to that effect[91] this finding was not clearly erroneous.

As for statutory priorities, Ashapura again asserted at the hearing that creditors have "a right [at the winding up stage] to a distribution pari passu with other unsecured creditors to the extent of the allowed amounts of their claim.  Just like in the United States, they do come after secured creditors and . . . various governmental parties."[92]  Bhatt testified that at the winding up stage, "the proceeding gets transferred to a court and the court applies priorities set forth in

---

[89]     *Id.*

[90]     *In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *3.

[91]     *See* Tr. 48:8-9 ("From BIFR, you can always appeal to the appellate authority.").

[92]     *Id.* 11:2-6.

[s]ection 529(a) of the company's act."[93]  Despite the fact that there is no

distribution requirement if there is no winding up and notwithstanding Indian case

law cited by Armada,[94] the Bankruptcy Court's finding that distribution generally

occurs according to statutory priorities is not clearly erroneous.

Ultimately, the Bankruptcy Court concluded that "the availability of

appellate review and the ability of creditors to participate before the BIFR

demonstrate that systematically SICA functions as a collective process that allows

for creditor participation."[95]  I agree.

### B.  Ashapura Met Its Burden of Proving that Its Assets and Affairs Are Subject to the Control or Supervision of a Foreign Court

Because the Bankruptcy Court omitted to address this element of the

statute in its decision, I consider this factor de novo.

#### 1.  BIFR Is a Court Under the Meaning of This Statute

Ashapura claims that BIFR constitutes a court under the meaning of

this statute because it is "an administrative board which exercises powers similar to

a court in India and oversees the possible rehabilitation of debtors under its

---

[93]    *Id*. 117:1-3.

[94]    *See* Reply Brief of Appellant Armada (Singapore) Pte Ltd ("Reply Mem.") at 5-6.

[95]    *In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *3.

-23-

authority . . . similar to the way that bankruptcy courts oversee Chapter 11 cases in the United States."[96]   Armada does not contest this point.  Relying on *In re Tradex*, I find that BIFR comes within the definition of a foreign court.[97]

## 2.   BIFR Had Control or Supervision over Ashapura's Assets and Affairs

Armada does not dispute that BIFR controlled Ashapura's "assets" during the SICA proceeding, only that Ashapura's "affairs" were left unsupervised.[98]  Armada is correct that the only references to the record cited by Ashapura on this issue concern the debtor's "assets" – not its "affairs."[99] Ashapura's argument that the BIFR oversees "the process of approving the plan of rehabilitation"[100] similarly fails to establish that BIFR oversaw Ashapura's affairs.

Armada argued at the hearing that because Ashapura is an international

---

[96]    Appellee Mem. at 21-22.  *See also* Declaration of Rajesh Bohra ("Bohra Decl.") at 7 ("The BIFR is considered a civil court.").

[97]    Moreover, before BIFR can order the winding up of "sick" company, it must first get approval from the High Court of India.  *See* Bohra Decl. at 11.

[98]    *See* Appellant Mem. at 18.  *Accord* Tr. 26:11-12 ("Its assets, no doubt, are subject to the control of the BIFR.").

[99]    *See* Reply Mem. at 9 (citing Appellee Mem. at 21 ("The BIFR is considered . . . custodian of all the assets of the sick industrial company . . . . Once the company is before the BIFR . . . the company cannot sell its assets without prior permission of the BIFR." (quotation marks omitted))).

[100]   Appellee Mem. at 21.

company "with affairs in many countries"[101] and "the BIFR doesn't have

extraterritorial reach"[102] "[o]nly the Indian affairs can be possibly subject to

supervision of the BIFR."[103]  This argument is meritless because every company

applying for Chapter 15 recognition has assets worldwide and would therefore fail

to satisfy this element.[104]

   By contrast, Ashapura is correct that the fact that the SICA proceeding

"leaves the Foreign Representative and Ashapura Board of Directors in control of

its business and operations"[105] is not inconsistent with supervision by a foreign

court because the foreign court need not direct the day-to-day operations of a debtor

to meet that standard.  Again, as the court in *In re ABC Learning Centres Ltd.*

pointed out, "the majority of U.S. bankruptcies proceed with minimal court

involvement."[106]  Much like the commission in *In re Oversight and Control

Commission of Avanzit*, the BIFR has the authority "to suspend the operation of

---

[101] Tr. 161:1-2.

[102] *Id*. 123:22-23.

[103] *Id*. 161:1-3.

[104] I note that Armada omits this argument from its brief.

[105] Appellee Mem. at 21 (quotation marks omitted).

[106] *In re ABC Learning Centres Ltd.*, 445 B.R. at 332.

contracts, settlements and awards under [section] 22(3) of SICA."[107]   Further,

section 24 of SICA regulates against fraudulent and preferential transfers, including

through a set of guidelines of conduct that BIFR imposes on a company once it is

declared "sick."[108]   These address not only the debtor's assets but, on the face of it,

its affairs, including company management.[109]   Though Ashapura did not raise this

evidence in its brief, it did enter it into the record before the Bankruptcy Court.[110]

Given the low legal standard for supervision over a debtor's affairs, I conclude that

Ashapura did meet its burden of proving that the BIFR had supervision or control

over Ashapura's affairs and assets.

### C.    Ashapura Met Its Burden of Proving that the SICA Filing Is a Proceeding Under a Law Related to Insolvency

---

[107]    Bohra Decl. at 8.

[108]    *See id*. at 10.

[109]    *See id.* (citing Board for Indus. & Fin. Reconstruction, Guidelines for Preparation of Rehabilitation Scheme, ¶ 10 (2008), *available at* http://bifr.nic.in/guidelines_for_rehabilitation_scheme.pdf ("The company/promoter(s) can induct strategic investor(s)/copromoter(s), but the company/existing promoter(s) would ensure that such induction of strategic investor(s)/co-promoter(s) does not entail change of management (COM) of the company. The company/promoter(s) would furnish the details of such strategic investor(s)/co-promoter(s) along with the copies of MOU(s)/agreement(s) entered into with them.")).

[110]    *See* Bohra Decl. at 10.

The Bankruptcy Court asserted that SICA "on its face, constitutes a law that relates to insolvency or adjustment of debt within the meaning of [s]ection 101(23)."[111]  I agree.  There is no doubt that SICA deals with corporate insolvency and the adjustment of corporate debts.  Moreover, SICA includes a structure of external administration provision – a SICA proceeding arranges a scheme of rehabilitation.[112]  Just as in *In re Betcorp*, BIFR has the statutory ability to alternate between various remedial measures as warranted by the circumstances.[113]  In fact, Armada appears to concede the point in its reply brief by failing to further address this element.  In sum, Ashapura has met its burden on this element.

### D.    Armada Did Not Meet Its Burden of Showing that the Public Policy Exception Under Section 1506 Applies

Armada carried the burden of proof on demonstrating that granting recognition was manifestly contrary to U.S. policy under the meaning of section 1506.  The Bankruptcy Court found that Armada did not meet that burden:  "none of the evidence offered by [Armada] succeeded in proving [that] key point in

---

[111]    *In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *1.

[112]    Declaration of Mayur Bhatt, ¶ 15.

[113]    *See* Bohra Decl. at 7 ("A number of measures, which can be considered rehabilitation/revival/restructuring in nature, have been provided in section 18 of SICA, and the Operating Agency . . . may consider the various such measures while preparing the draft rehabilitation scheme . . . .").

dispute."[114]  Notwithstanding Armada's insistence at the hearing that fundamental principles are violated by the Bankruptcy Court's recognition, its arguments are duplicative of those made under the "collective" element.  Nothing in the case law suggests that if the proceeding is collective in nature its recognition can be deemed to be against public policy – nor do the facts warrant such a finding.

## V.    CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is AFFIRMED.  The Clerk of the Court is directed to close this appeal [docket # 1] and this case.

---

[114]    *In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *8.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 28, 2012

## - Appearances -

**For Appellant:**

Robert K. Gross, Esq.
Alan Van Praag, Esq.
Edward W. Floyd, Esq.
Eaton & Van Winkle LLP
3 Park Avenue
New York, New York 10016
(212) 779-9910

**For Appellee:**

Ira A. Reid, Esq.
Joseph Samet, Esq.
Kathryn Ryan, Esq.
Baker & McKenzie LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 891-3976